**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Karry Dale Kisslinger,<br><br>Defendant. | Crim. No. 18-266 (SRN/BRT)<br><br>**REPORT AND**<br>**RECOMMENDATION** |

---

Joseph H. Thompson, Esq., Assistant United States Attorney, counsel for Plaintiff.

Douglas L. Micko., Esq., and Douglas Olson, Esq., Assistant Federal Public Defender, counsel for Defendant.

---

BECKY R. THORSON, United States Magistrate Judge.

## INTRODUCTION

This matter is before the Court on Defendant's Motion to Suppress Statements, Admissions, and Answers (Doc. No. 19). On February 26, 2019, the Court held a hearing on the motion at which the parties were represented by counsel. (Doc. No. 35.) At the hearing, Special Agent Glenn Moule from the Federal Bureau of Investigation ("FBI") testified concerning the circumstances surrounding Defendant's statements that are the subject of the Defendant's motion. The Government offered and the Court received in evidence two exhibits: (1) an audio recording of the interview at issue; and (2) a target letter to Defendant dated January 18, 2018. (Doc. No. 32, Exhibit List.) The parties

submitted post-hearing briefing as ordered by the Court. (Doc. Nos. 39, 40.) As discussed below, the Court recommends that Defendant's motion be denied.

## BACKGROUND[1]

Special Agent Moule is the case agent for the investigation of this fraud case against Defendant. (Tr. 9.) He testified that Defendant used to operate a small wind turbine company, and that the allegation in this case is "that multiple customers of his provided him with money that he failed to deliver their product, and he used some of their funds for personal expenses." (Tr. 9.)

On January 23, 2018, Special Agent Moule and another FBI agent interviewed Defendant at his single-family home in Humble, Texas. (Tr. 9–10.) At that time, Special Agent Moule had been working on this case for well over a year. (Tr. 19.) Both agents were wearing business suits and carrying a firearm; however, the firearms were not visible. (Tr. 10.) Without providing advance notice, the agents arrived at Defendant's home between 8:00 and 8:30 a.m. (Tr. 11, 17.) When they rang the doorbell, Defendant came to the door and Special Agent Moule identified himself as an FBI agent. (Tr. 11.) Special Agent Moule told Defendant he was interested in some information regarding his wind turbine business he had in Minnesota and asked Defendant if he could talk to him. (Tr. 11, 18.) Defendant appeared surprised that the FBI was at his door but allowed the

---

[1] The following summary is based on Special Agent Glenn Moule's testimony provided at the February 26, 2019 hearing, along with the admitted exhibits. Special Agent Moule has worked for the FBI for approximately nine years, and is currently working out of the Mankato, Minnesota office on a variety of cases, including white collar/fraud cases. (Doc. No. 37, 2/26/19 Hearing Transcript ("Tr.") 8–9.)

2

agents inside his house and they all sat town at a table about twenty feet from the door. (Tr. 11.)

Special Agent Moule told Defendant that he was not under arrest, that he did not have to talk to them, that he could ask them to leave his house at any time, and that the decision was completely up to Defendant. (Tr. 11; 2/26/19 Hr'g Ex. 2.) Defendant agreed at that time to talk to Special Agent Moule. (Tr. 11.) During their conversation, which was recorded, Defendant did not at any time ask for a lawyer and did not say that he did not want to talk.[2] (Tr. 11–12.) The agents did not handcuff Defendant, nor did they restrain or restrict his movements in any way. (Tr. 12.) The conversation was casual and lasted for approximately one hour. (Tr. 12, 18.) About half-way through the interview, Defendant got up and went to his front office area near the front door to check on a phone call that he missed. (Tr. 12.) After about ten seconds, Special Agent Moule got up to see where he was, for his own personal safety reasons. (Tr. 12.) When Defendant returned to the table, the interview resumed.

At the end of the interview, while still sitting at the table, Special Agent Moule handed Defendant a target letter from the U.S. Attorney's Office and informed him that he was the subject of a criminal investigation. (Tr. 14, 21.) Defendant asked Special Agent Moule what wire fraud was (which was referenced in the target letter), and Special

---

[2] At one point early in the interview, Defendant asked Special Agent Moule whether he should be getting an attorney. Special Agent Moule told him that he could not give him legal advice but reminded him that he did not have to talk to them at this time. Defendant did not stop the interview at that time, but instead continued with the interview. (2/26/19 Hr'g Ex. 2.)

(Footnote Continued on Following Page)

Agent Moule talked to him about it.[3] (Tr. 14, 16.) Special Agent Moule also told Defendant that he could contact the U.S. Attorney's Office if he had any other questions. (Tr. 14.) Defendant asked Special Agent Moule for his business card, which Special Agent Moule gave to him along with his cell phone number, and then the agents got up and left after thanking Defendant for his time. (Tr. 14.) The agents did not arrest Defendant at that time. (Tr. 16.) Defendant was later indicted in November 2018, and he thereafter self-reported to the District of Minnesota for his initial appearance. (Tr. 16.)

## DISCUSSION

Defendant challenges the admissibility of the statements he made to FBI agents on January 23, 2018, on grounds that he was provided no *Miranda* warnings when they were required. The Government opposes Defendant's motion to suppress and argues that the January 2018 interview was both non-custodial and voluntary, and therefore *Miranda* warnings were not required.

---

[3] The entirety of the target letter states as follows:

Dear Mr. Kisslinger:

> This letter is to inform you that you have been designated as a "target" of a federal investigation which involves alleged wire fraud. The purpose of this letter is to advise you that the United States is conducting a grand jury investigation of this offense.
>
> If you are interested in discussing a pre-indictment resolution to this investigation, please have your counsel contact me. If I do not hear from you or your counsel prior to February 7, 2018, I will assume that you are not interested in a pre-indictment resolution of this matter and will begin the process of obtaining an indictment in this matter.

(2/26/19 Hr'g Ex. 2.)

To use a defendant's statements made during a custodial interrogation against him at trial, government agents must provide a *Miranda* warning prior to questioning. The warning must inform a defendant that he has the right to remain silent, that anything he does say can be used against him as evidence, that he has a right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). These warnings need not follow a precise formulation, and the "inquiry is simply whether the warnings reasonably convey to a suspect his rights as required by *Miranda*." *Duckworth v. Eagan*, 492 U.S. 195, 203 (1989) (quotations and alterations removed).

A custodial interrogation that triggers the need for *Miranda* warnings is one that involves "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. When analyzing whether a particular defendant was in custody at the time of an interrogation, "the ultimate inquiry is simply whether there [was] . . . restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quotations omitted); *see also United States v. Huether*, 673 F.3d 789, 794 (8th Cir. 2012) ("To determine whether a defendant was in custody for *Miranda* purposes, a court looks to the totality of the circumstances confronting the defendant at the time of the interview, and asks whether a reasonable person in his position would consider his freedom of movement restricted to the degree associated with formal arrest.") (quotations omitted). Although not an exhaustive list, in

5

determining whether a defendant was in custody at the time of questioning, the Court considers such factors as:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990); *see also United States v. Czichray*, 378 F.3d 822, 827–28 (8th Cir. 2004) (indicating that the *Griffin* factors serve as a guide in resolving the question "whether the defendant was restrained as though he were under formal arrest"). However, "'custody' cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly . . . . the ultimate inquiry must always be whether the defendant was restrained as though he were under formal arrest." *Czichray*, 378 F.3d at 827–28. In making this determination, courts must consider the "totality of the circumstances," *United States v. Sanchez*, 676 F.3d 627, 630 (8th Cir. 2012), and ask whether, in light of all the circumstances, "a reasonable person in [the suspect's] position would have felt free to end the interview." *United States v. Aldridge*, 664 F.3d 705, 711 (8th Cir. 2011).

To trigger the protections of *Miranda*, an individual must also be subjected to "interrogation." Interrogation refers to "questioning initiated by law enforcement officers." *Miranda*, 384 U.S. at 444. And it is defined as "express questioning or its

6

functional equivalent," which includes "words or action on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980). Here, it is undisputed that Defendant was interrogated. The only question now before the Court is whether Defendant was in custody at the time of the interrogation.

Defendant argues that certain factors support finding that the interview was custodial. Defendant points to the fact that Special Agent Moule arrived at Defendant's home unannounced and during early morning hours. Defendant also argues that the interview was conducted in a police-dominated atmosphere because a second agent was present and because a "subtle show of force" was used when Special Agent Moule followed Defendant into other areas of the home when Defendant went into another room to check on a missed phone call. (Doc. No. 39, Def.'s Mem. of Law in Supp. of Mot. to Suppress 4.)

This Court disagrees with Defendant and concludes that he was not in custody when he was questioned on January 23, 2018; therefore, his statements to the agents that day need not be suppressed. The first *Griffin* factor weighs in favor of finding Defendant not in custody because the evidence shows that Special Agent Moule told Defendant that he was not under arrest, that he did not have to speak to agents, and that he could tell them to leave. This is "powerful evidence that a reasonable person would have understood that he was free to terminate the interview." *Czichray*, 378 F.3d at 826; *see also id.* ("[T]he most obvious and effective means of demonstrating that a suspect has not

7

been taken into custody . . . is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will." (quoting *Griffin*, 922 F.2d at 1349)).

The second, third, and fourth *Griffin* factors (*i.e.*, that Defendant had unrestrained freedom of movement during questioning, Defendant voluntarily agreed to respond to questions, and no strong-arm tactics or deceptive stratagems were employed during questioning) also weigh in favor of finding Defendant not in custody. Even though the agents arrived unannounced and early, and Special Agent Moule could not remember the exact words that were used at the doorstep before entering, it is undisputed that Defendant allowed the FBI agents into his home and voluntarily acquiesced to speaking with them. *See, e.g.*, *United States v. Warsame*, 488 F. Supp. 2d 846, 858 (D. Minn. 2007) (finding that defendant voluntarily acquiesced to questioning when the defendant invited officers into his home and voluntarily submitted to questioning after being advised that the interviews were voluntary and that he was not under arrest). There is no evidence that Defendant was pressured into allowing the agents into his home or pressured into answering questionings. The agents did not restrain him or brandish weapons at him at any point, and there were only two officers present during the questioning who were wearing business suits and concealed weapons.[4] Defendant was questioned in the comfort of his own home, at a table near the entrance to his home. The questioning lasted approximately an hour, and the conversation was casual. At no time

---

[4]  There is no evidence that Defendant was aware that the agents were armed at the time of the interview.

8

did the agents threaten Defendant or raise their voice during the interview. (*See generally* 2/26/19 Hr'g Ex. 2.) Defendant also had freedom of movement during the interview, which is evidenced by the fact that he did stand up at one point and go into another room unaccompanied to check on a missed phone call. Although Special Agent Moule did get up for a few seconds as well to see where Defendant was, Special Agent Moule testified that he did this for his own personal safety. (Tr. 12); *see United States v. Hammerschmidt*, No. 15-86(1) (DSD/JSM), 2015 WL 5313513, at *2 (D. Minn. Sept. 9, 2015) (concluding defendant was not deprived of his freedom of movement due to the agents' standing in an area blocking access to the dining room when there was no evidence defendant asked to leave the dining room or that the placement was "tantamount to a non-verbal threat or physical intimidation"). Therefore, the evidence reflects that Defendant voluntarily agreed to answer the agents' questions, Defendant had unrestrained freedom of movement during the questioning, and the agents did not use strong-arm tactics or deceptive stratagems during the interview. *See Czichray*, 378 F.3d at 829 ("This is not a case where a suspect sought to exercise his option of terminating the interview, only to meet resistance from his interrogators.").

Although the fifth *Griffin* factor (*i.e.*, whether the atmosphere of the questioning was police dominated) is a closer call because there were two agents present for the interview with holstered weapons, this Court concludes the factor does not tip the scale to turn this interview into a custodial interview. Here, Defendant agreed to be interviewed, the interview took place in the comfort of Defendant's home, the agents were not wearing uniforms, the agents' holstered weapons likely were not visible to Defendant during the

9

questioning, and the agents' questioning was calm and conversational. *See United States v. Bordeaux*, 400 F.3d 548, 560–61 (8th Cir. 2005) (finding that an interview conducted by two officers in a police vehicle was not coercive).

Finally, the sixth *Griffin* factor undeniably weighs in the Government's favor, because Defendant was not placed under arrest at the termination of the questioning. The fact that Special Agent Moule handed Defendant a target letter at the end of the interview does not alter the analysis. Defendant had voluntarily agreed to be interviewed, and voluntarily answered the questions asked. The withholding of the letter until the end of the interview was not coercive. Therefore, looking at the facts as a whole, the totality of the circumstances support the conclusion that Defendant was free to end the interview at any moment and that a reasonable person in his position would not have felt coerced to speak with the agents. There is no basis for this Court to conclude that the time of day, or the fact that Special Agent Moule got up from his chair to see where Defendant went for the protection of himself and the other agent, transformed the atmosphere of the January 23, 2018 interview from a calm, straightforward discussion into a custodial interrogation.

Although true that "the fact that the individual has become the focus of the investigation is relevant to the extent that the suspect is aware of the evidence against him and this awareness contributes to the suspect's sense of custody," *Griffin*, 922 F.2d at 1348 (quotations omitted), and although it was likely alarming for Defendant to see government agents at his doorstep early in the morning, there is no indication that Defendant was subjected to any coercive police action when Special Agent Moule asked

10

whether Defendant would have a conversation with them or during the conversation itself. Considering the *Griffin* factors and the totality of the circumstances in this case, this Court finds that Defendant was not in custody at the time of the interview, and therefore, admitting Defendant's January 23, 2018 statements to agents at trial will not violate his Fifth Amendment rights. Accordingly, Defendant's motion to suppress should be denied.

## RECOMMENDATION

Based on the above, and on the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.   Defendant's Motion to Suppress Statements, Admissions, and Answers (Doc. No. 19) be **DENIED**.

Date:  April 8, 2019  *s/ Becky R. Thorson*
BECKY R. THORSON
United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b), any party may file and serve specific written objections to this Report and Recommendation by **April 22, 2019**. A party may respond to those objections by **May 6, 2019**. All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 7 days from the date of its filing. If timely objections are filed, this Report will be considered under advisement from the earlier of: (1) 7 days after the objections are filed; or (2) from the date a timely response is filed.